ACCEPTED
12-15-00287-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
12/29/2015 5:44:05 PM
Pam Estes
CLERK

No. 12-15-00287-CV

_____

# In the Twelfth Court of Appeals
# Tyler, Texas

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
12/29/2015 5:44:05 PM
PAM ESTES
Clerk

_____

BLUE CROSS & BLUE SHIELD OF TEXAS,
a Division of HEALTH CARE SERVICE CORPORATION,

Appellant,

v.

EAST TEXAS MEDICAL CENTER,

Appellee.

_____

*Accelerated Appeal*
*from the 241st Judicial Court Smith County, Texas, No. 15-1165-C*

_____

**BRIEF OF APPELLANT**

_____

GREGORY D. SMITH
State Bar No. 18600600
STEPHEN M. SPITZER
State Bar No. 18954850
RAMEY & FLOCK, P.C.
100 E. Ferguson St., Suite 500
Tyler, Texas 75702
903-597-3301
gregs@rameyflock.com
sspitzer@rameyflock.com

MARTIN J. BISHOP
State Bar No. 24086915
REED SMITH, LLP
811 Main Street, Suite 1700
Houston, Texas 77002-6110
713-469-3800
mbishop@reedsmith.com

*Attorneys for Appellant*

***ORAL ARGUMENT REQUESTED***

## THE PARTIES AND THEIR COUNSEL

**I.     Appellant:**

Health Care Service Corporation, an unincorporated division of which is Blue Cross and Blue Shield of Texas

**II.    Counsel for Appellant:**

Greg Smith
State Bar No. 18600600
Stephen M. Spitzer
State Bar No. 18954850
Ramey & Flock, P.C.
100 East Ferguson, Suite 500
Tyler, TX  75702
Telephone: (903) 597-3301
Facsimile:   (903) 597-2413
gsmith@rameyflock.com
sspitzer@rameyflock.com

Martin J. Bishop
State Bar No. 24086915
Reed Smith, LLP
811 Main Street, Suite 1700
Houston, TX  77002-6110
Telephone: (713) 469-3800
mbishop@reedsmith.com

**III.   Appellee:**

East Texas Medical Center

## IV. Counsel for Appellee:

Deborah Race
State Bar No. 16448700
Otis W. Carroll, Jr.
State Bar No. 03895700
Collin M. Maloney
State Bar No. 00794219
Ireland, Carroll & Kelley, P.C.
6010 South Broadway Ave, Suite 500
Tyler, TX  75703
Telephone: (903) 561-1600
Facsimile:  (903) 581-1071
otiscarroll@icklaw.com
cmaloney@icklaw.com
drace@icklaw.com

T. John Ward
State Bar No. 20848000
Claire Abernathy Henry
State Bar No. 24053063
Ward, Smith & Hill, PLLC
1127 Judson Road, Suite 220
Longview, Texas 75601
Telephone: (903) 757-6400
Facsimile:  (903) 757-2323
tjw@wsfirm.com
claire@wsfirm.com

Michael C. Coker
State Bar No. 04527100
Adams & Coker, P.C.
4540 Kinsey Drive
Tyler, Texas 75703
Telephone: (903) 581-1196
Facsimile:  (903)
mikecoker@adams-coker.com

David C. Frederick
Eduardo F. Bruera
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
dfrederick@khhte.com
ebuera@khhte.com

Adam N. Bitter
Assistant Attorney General
State Bar No. 24085070
Financial Litigation, Tax, & Charitable Trusts Division
P.O. Box 12548
Austin, TX  78711-2548
Telephone: (512) 936-2422
Facsimile:  (512) 477-2348
adam.bitter@texasattorneygeneral.gov

## V.    Other Parties (Co-Defendants) in the Trial Court:

Aetna Health, Inc.
Aetna Life Insurance Company

Cigna Healthcare of Texas, Inc.
Cigna Health and Life Insurance Company

## VI.    Counsel for Other Parties:

1. Counsel for the Aetna Defendants:

John B. Shely
State Bar No. 18215300
Dimitri D. Zgourides
State Bar No. 00785309
Mitchell A. Reid
State Bar No. 24037346
Andrews Kurth LLP
600 Travis St., Suite 4200
Houston, TX  77002
Telephone: (713) 220-4200
Facsimile:  (713) 220-4285
jshely@andrewskurth.com

dzgourides@andrewskurth.com
mitchreid@andrewskurth.com

Jerry Beane
State Bar No. 01966000
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401
jerrybeane@andrewskurth.com

Clay M. White
State Bar No. 21292220
White Shaver
205 West Locust Street
Tyler, TX 75702
Telephone: (903) 533-9447
Facsimile: (903) 595-3766
cwhite@whiteshaverlaw.com

2. Counsel for the Cigna Defendants:

Eliot T. Burriss
State Bar No. 24040611
Nicole Figueroa
State Bar No. 24069716
Colleen Deal
State Bar No. 24082909
DLA Piper LLP
1717 Main Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
eli.burriss@dlapiper.com
nicole.figueroa@dlapiper.com
colleen.deal@dlapiper.com

     /s/ Greg Smith
Gregory D. Smith

# TABLE OF CONTENTS

**Page**

THE PARTIES AND THEIR COUNSEL ...................................................... i

TABLE OF AUTHORITIES ................................................................ viii

KEY TO RECORD CITATIONS .............................................................. xi

STATEMENT OF THE CASE ..................................................................1

ISSUE ........................................................................................3

INTRODUCTION AND STATUTORY BACKGROUND ...........................4

FACTS AND PROCEDURAL HISTORY .......................................................8

    A.    Factual Background ...................................................8

        1.    BCBSTX Provides Insurance To Its Members In Tyler, Texas ....................................................8

        2.    ETMC Is A Large Hospital In Tyler, Texas ................. 12

        3.    The Long History Of Contracts And Negotiations Between BCBSTX And ETMC.................................. 13

        4.    The Status Of The Relationship Between BCBSTX And ETMC Before The Injunction.............................. 16

    B.    Procedural History .................................................. 18

        1.    ETMC Sues BCBSTX, Alleging A Right To Be Part Of BCBSTX's PPO Network—Initially Seeking Damages Only................................... 18

        2.    ETMC Later Requests A Mandatory Temporary Injunction, Claiming That It Would Go Out Of Business Before Trial Without One............................. 19

        3.    At The Injunction Hearing, ETMC Argues That, Without An Injunction, It Will Lose Money And Be Forced To Cut Services Before Trial ....................... 20

    C.    The Trial Court's Mandatory Injunction Requiring BCBSTX To Contract With ETMC......................................... 23

SUMMARY OF ARGUMENT .................................................................. 25

STANDARD OF REVIEW ..................................................................... 28

ARGUMENT .......................................................................................... 28

I.      The Mandatory Injunction Should Be Vacated Because The
        Trial Court, At ETMC's Urging, Applied The Wrong Legal
        Standard ...................................................................................... 28

II.     The Mandatory Injunction Should Be Vacated Because It
        Violates Settled Law Governing Injunctions In Two
        Fundamental Ways ...................................................................... 32

        A.      The Mandatory Injunction Impermissibly Alters The
                Decades-Long Lawful Status Quo .................................... 32

        B.      ETMC Did Not Prove The Core Element Of Probable,
                Imminent, Irreparable Injury ........................................... 34

III.    The Mandatory Injunction Should Be Vacated Because, As A
        Matter Of Law, ETMC Does Not Have A Cause Of Action
        Against ETMC And Because ETMC Did Not Prove A Probable
        Right To Relief ............................................................................ 46

        A.      ETMC Has No Viable Cause of Action Because It
                Cannot Bring A Private Lawsuit To Enforce The Texas
                Insurance Code ................................................................. 46

        B.      ETMC Did Not Prove A Probable Right To Relief
                Because It Did Not Show A Violation Of The Texas
                Insurance Code ................................................................. 50

CONCLUSION ...................................................................................... 54

CERTIFICATE OF SERVICE .............................................................. 55

CERTIFICATE OF COMPLIANCE ..................................................... 56

APPENDICES:

A. Temporary Injunction And Order Setting Final Trial On The Merits, dated November 10, 2015 (CR 305-309)

B. TEX. INS. CODE § 1301.051

C. TEX. INS. CODE § 1301.006

# TABLE OF AUTHORITIES

**CASES**                                                                                                                  **Pages**

*Ballenger v. Ballenger,*
   694 S.W. 2d 72 (Tex. App.–Corpus Christi 1985, no writ) .............................37

*Banks v. Collins,*
   257 S.W. 2d 97 (Tex. 1953) ............................................................................39

*Brazoria County Appraisal Dist. v. Notlef, Inc.,*
   721 S.W. 2d 391 (Tex. App.–Corpus Christi 1986, no writ) ......................35, 41

*Butnaru v. Ford Motor Co.,*
   84 S.W. 3d 198 (Tex. 2002) .......................................................................*passim*

*Calvary Baptist Church at Tyler v. Adams,*
   570 S.W. 2d 469 (Tex. Civ. App.–Tyler 1978, no writ) ...................................35

*Canteen Corp. v. Republic of Tex. Props., Ins.,*
   773 S.W. 2d 398 (Tex. App.–Dallas 1989, no writ).........................................36

*Cernosek Enters., Inc. v. City of Mont Belvieu,*
   338 S.W. 3d 655 (Tex. App.–Houston [1st Dist.] 2011, no pet.).....................48

*City of Irving v. Dallas County Flood Control Dist.,*
   383 S.W. 2d 571 (Tex. 1964) .........................................................................33

*El Tacaso, Inc. v. Jireh Star, Inc.,*
   356 S.W. 3d 740 (Tex. App.–Dallas 2011, no pet.) .........................................36

*Grubaugh v. Texas Employers Ins. Ass'n,*
   677 S.W. 2d 812 (Tex. App.–Fort Worth 1984),
   *dismissed* (Mar. 20, 1985) .............................................................................28

*Gym-N-I Playgrounds, Inc. v. Snider,*
   220 S.W. 3d 905 (Tex. 2007) .........................................................................50

*Iranian Muslim Org. v. City of San Antonio,*
   615 S.W. 2d 202 (Tex. 1981) .....................................................................29, 32

*Kolbo v. Blair,*
   379 S.W.2d 125 (Tex. App.–Corpus Christ 1964, writ ref'd n.r.e.) .................39

*Landry's Seafood Inn & Oyster Bar-Kemah, Inc. v. Wiggins,*
919 S.W. 2d 924 (Tex. App.–Houston [14th Dist.] 1996, no writ)....................35

*Lifeguard Benefit Svcs. v. Direct Med. Net.,*
308 S.W. 3d 102 (Tex. App.–Fort Worth [2nd Dist.] 2010, no pet.) ..........29, 35

*Lively v. Carpet Services, Inc.,*
904 S.W. 2d 868 (Tex. App.–Houston [1st Dist.] 1995),
*writ denied* (Feb. 9, 1996)..................................................................................48

*Markel v. World Flight, Inc.,*
938 S.W. 2d 74 (Tex. App.–San Antonio 1996, no writ)................................30

*Merrell Dow Pharmaceuticals, Inc. v. Havner,*
953 S.W. 2d 706 (Tex. 1997) ....................................................................39, 42

*Morris v. Collins,*
881 S.W. 2d 138 (Tex. App.–Houston [1st Dist.] 1994),
*writ denied* (Oct. 13, 1994)............................................29, 30, 31, 35

*Mother and Unborn Baby Care v. Doe,*
689 S.W. 2d 336 (Tex. App.–Fort Worth 1985, writ dism'd)...............28, 29, 35

*M P I, Inc. v. Dupre,*
596 S.W. 2d 251 (Tex. App.–Fort Worth 1980, writ ref'd n.r.e.) .....................36

*Nixon v. Mr. Property Management Co.,*
690 S.W. 2d 546 (Tex. 1985) ........................................................................48

*NMTC CORP. v. Conarroe,*
99 S.W. 3d 865 (Tex. App.–Beaumont 2003, no pet.) .....................................43

*Rhodia, Inc. v. Harris County,*
470 S.W. 2d 415 (Tex. App.–Houston [1st Dist.] 1971, no writ) ......... 29-30, 31

*RP&R, Inc. v. Territo,*
32 S.W. 3d 396 (Tex. App.–Houston [14th Dist.] 2000, no pet.) .........29, 30, 32

*State Dept. of Highways & Public Transp. v. Elkins Lake Municipal Utility
Dist.,*
593 S.W. 2d 401 (Tex. App.–Houston [14th Dist.] 1980) .......................... 33-34

*Sun Oil Co. v. Whitaker,*
424 S.W. 2d 216 (Tex. 1968) ........................................................................29

*Sw. Research Inst. v. Keraplast Techs., Ltd.*,
103 S.W. 3d 478 (Tex. App.–San Antonio 2003, no pet.) ...............................34

*Tuma v. Kerr Cnty.,*
336 S.W. 3d 277 (Tex. App.–San Antonio 2010, no pet.) ...............................48

*Walker v. Packer,*
827 S.W. 2d 833 (Tex. 1992) ........................................................................28

*Walling v. Metcalfe,*
863 S.W. 2d 56 (Tex. 1993) ..........................................................................29

## OTHER AUTHORITIES

28 TEX. ADMIN. CODE § 3.4 ...............................................................................48

28 TEX. ADMIN. CODE § 3.3701 ......................................................................5, 49

28 TEX. ADMIN. CODE § 3.3704 ......................................................................6, 48

TEX. INS. CODE § 1301.005 ............................................................................6, 17

TEX. INS. CODE § 1301.006 ............................................................................5, 47

TEX. INS. CODE § 1301.007 ........................................................................5, 47, 48

TEX. INS. CODE § 1301.009 ...............................................................................47

TEX. INS. CODE § 1301.051 ................................................................ 6, 33, 47, 50

TEX. INS. CODE § 1301.0055 ......................................................................5, 47, 49

# KEY TO RECORD CITATIONS

**CR __** ................Clerk's Record.

**RR __** ................November 10, 2015 Injunction Hearing Transcript, reproduced in Volume 1 of the Reporter's Record.

**PX __** ................Plaintiff's Exhibits from the November 10, 2015 Injunction Hearing, reproduced in Volume 2 of the Reporter's Record. If required, the Bates number is used to cite a specific page.

**DX __** ................Defendant's Exhibits from the November 10, 2015 Injunction Hearing, reproduced in Volumes 2 and 3 of the Reporter's Record. If required, the Bates number is used to cite a specific page.

**8/19 Tr __** ..........August 19, 2015 Motions Hearing Transcript, reproduced in its own volume of the Reporter's Record.

**Supp RR __** .......Supplemental Record, reproduced in its own volume of the Reporter's Record.

# STATEMENT OF THE CASE

*Nature of the Case*     This is an appeal from a mandatory temporary injunction. Plaintiff East Texas Medical Center ("ETMC"), a hospital in Tyler, Texas, filed this lawsuit against Defendant Blue Cross and Blue Shield of Texas ("BCBSTX"), a division of Health Care Service Corporation, and other insurers asserting tort claims (negligence and interference with prospective business relations) and statutory claims, all arising from ETMC's allegation that the insurers owe duties to ETMC under Texas Insurance Code, Chapter 1301. According to ETMC, the Insurance Code entitles it to a global preferred provider ("PPO") contract with BCBSTX even though the parties never had such a contract during their decades-long relationship, BCBSTX has complied with the Insurance Code, and the Texas Department of Insurance has approved BCBSTX's PPO network.

*Trial Court*     The Honorable Jack Skeen, Jr., 241st Judicial District, Smith County

*Proceedings Below*     ETMC initially filed a Petition alleging that BCBSTX and other insurers acted wrongfully by not contracting with ETMC as a preferred provider in their PPO networks, asserting tort claims and seeking monetary damages only. Months later, ETMC amended its Petition, adding a claim for violation of the Texas Insurance Code and a demand for punitive damages. ETMC also added an Application for Temporary Injunctive Relief, demanding that BCBSTX (but not the other defendants) immediately add ETMC to its PPO network pending resolution of this case. After abbreviated discovery and over BCBSTX's objections, the trial court held a time-constrained, one-day temporary injunction hearing.

***Disposition***      At the end of the November 10, 2015 hearing, the trial court issued a mandatory temporary injunction requiring BCBSTX to enter into a preferred provider contract with ETMC.

## ISSUE

Under the heightened burden that applies when a mandatory injunction is sought, did the trial court err in issuing a mandatory temporary injunction requiring BCBSTX to contract with ETMC where (1) the injunction alters the lawful *status quo*; (2) Texas common and statutory law do not require such a contract; and (3) ETMC failed to meet its burden to show that it (a) has a viable cause of action, (b) has a probable right to relief, and (c) will suffer a probable, imminent, and irreparable injury absent the injunction?

**INTRODUCTION AND STATUTORY BACKGROUND**

The trial court's mandatory injunction alters the decades-long lawful *status quo* by compelling BCBSTX into a preferred provider ("PPO") contract with ETMC even though the parties have never had such a contract, the Texas Insurance Code does not impose upon BCBSTX a duty to enter into such a contract, and ETMC did not prove that it would suffer imminent, irreparable injury without such a contract.

BCBSTX provides insurance coverage and services to its members in Texas through a variety of plans, including PPO plans. BCBSTX covers medical services for its members at ETMC through traditional indemnity insurance and its HMO plan. Although BCBSTX and ETMC have had discussions about ETMC joining BCBSTX's PPO networks over the past three decades, BCBSTX and ETMC have never entered into a contract for ETMC to be a preferred provider in BCBSTX's general PPO networks because those networks are adequate without ETMC. Indeed, the Texas Department of Insurance ("TDI")—which has exclusive jurisdiction to enforce the Texas Insurance Code provisions ETMC invokes—has approved BCBSTX's PPO networks because they are adequate.

This lawsuit arises out of ETMC's contention that it is entitled to a PPO contract with BCBSTX. ETMC's bases that contention on its view that certain provisions of Chapter 1301 of the Texas Insurance Code impose upon BCBSTX a duty to designate ETMC as a preferred provider in its PPO

networks. An examination of Chapter 1301 reveals the flaws in ETMC's position.

The Texas Legislature enacted Chapter 1301 to regulate PPOs. The statute's primary goal is to ensure reasonable health care coverage for Texas residents, not to protect providers like ETMC. TEX. INS. CODE § 1301.006 (requiring insurers to ensure the "availability of and accessibility to adequate personnel, specialty care, and facilities" in their PPO networks). TDI, which oversees the adequacy of an insurance plan's coverage, will approve a PPO plan only if it provides adequate coverage. *See* TEX. INS. CODE § 1301.0055 (directing TDI to "adopt network adequacy standards to "ensure availability of, and accessibility to, a full range of contracted physicians and health care providers to provide health care services to insureds"); *see also* TEX. INS. CODE § 1301.007 (directing TDI to adopt rules to "ensure reasonable accessibility and availability of preferred provider services to residents of this state"). In keeping with TDI's role in the statutory scheme (and the goal of a uniform statewide regulatory framework), the Texas Legislature did not provide for private enforcement of the Code provisions ETMC invokes. Consistent with this, TDI's regulations expressly state that their requirements do not "create … a basis for a private cause of action." 28 TEX. ADMIN. CODE § 3.3701(d).

Nothing in Chapter 1301 suggests that it was enacted to create privately-enforceable duties flowing to healthcare providers. Chapter 1301 does not require an insurer to contract with every provider or to designate

any particular provider as preferred provider in a PPO network. Instead, Chapter 1301 only requires insurers to provide "a fair, reasonable, and equivalent opportunity [for providers] to apply to be and to be designated as a preferred provider," and not to "unreasonably withhold a designation as a preferred provider." TEX. INS. CODE § 1301.051(a), (b). Chapter 1301 specifies that, aside from the requirements to act fairly and reasonably, the Code "does not prohibit an insurer from rejecting a physician's or health care provider's application for designation based on a determination that the preferred provider benefit plan has sufficient qualified providers." TEX. INS. CODE § 1301.051(d). The Code thus contemplates that there will be out-of-network providers and mandates how they are to be compensated "[i]f services are not available through a preferred provider." TEX. INS. CODE § 1301.005; *see also* 28 TEX. ADMIN. CODE § 3.3704(a)(12) (PPO plan is not unjust or unfairly discriminatory if "insureds have the right to receive care from a nonpreferred provider" when "medically necessary covered services are not reasonably available through preferred providers").

The trial court nonetheless entered a mandatory injunction requiring BCBSTX to do what Chapter 1301 does not require it to do—enter into a PPO contract with ETMC. There are several problems with the trial court's order—each of which provides an independent ground for reversal.

First, the trial court followed ETMC's lead and used the wrong legal standard—focusing on a "balance of harms" inquiry almost to the exclusion

- 6 -

of the other required injunction elements and minimizing ETMC's evidentiary burden.

Second, the mandatory injunction violates foundational injunction law because it destroys, not preserves, the lawful *status quo* by compelling BCBSTX to enter into a general preferred provider contractual relationship with ETMC even though the parties have never had such a contract and the Insurance Code does not require such a contract.

Third, ETMC did not carry its burden to prove that it would suffer imminent, irreparable injury without an injunction. ETMC asserts that it is losing money and will be compelled to cut services before this litigation is completed if it is not designated as a preferred provider—but it presented no objective evidence to support that assertion. Indeed, the evidence showed the opposite: ETMC's financial losses will not force it to cut any services before trial (if at all).

Fourth, ETMC did not meet its burden to show that it has a cause of action and a probable right to relief. As a matter of law, ETMC has no private right of action to enforce the Code provisions it invokes. And, in any event, Chapter 1301 does not impose a duty on BCBSTX to contract with ETMC. The Code only requires BCBSTX to give ETMC a fair, reasonable and equivalent opportunity to be part of BCBSTX's preferred provider networks—and the objective evidence shows that BCBSTX has done just that. BCBSTX's decision not to designate ETMC as a preferred provider in

- 7 -

its PPO networks was reasonable because its PPO networks provide adequate coverage to BCBSTX members (as found by TDI).

## FACTS AND PROCEDURAL HISTORY

### A. Factual Background

#### 1. BCBSTX Provides Insurance To Its Members In Tyler, Texas

BCBSTX is a division of Health Care Service Corporation, a customer-owned insurance company. RR 186, 200, 218. BCBSTX offers its services to both employers and individuals. RR 228, 267-268. BCBSTX offers both "fully insured" plans (*i.e.*, the employer or individual member pays a premium to BCBSTX and BCBSTX pays for covered health care expenses) and "self-funded" plans (*i.e.*, an employer uses BCBSTX to administer its health benefit plan, but uses its own money to pay its employees' covered health care expenses). RR 267-268. Approximately one third of BCBSTX's business consists of fully insured plans, and approximately two thirds consist of self-funded plans. RR 267-268.

BCBSTX provides healthcare coverage to its members by negotiating contracts with various medical providers to create "networks" of providers that are willing provide medical services to BCBSTX members at pre-established contracted rates. RR 218-219. BCBSTX designs and customizes its provider networks—and elects with which providers to contract and for which network—to meet the different needs of its members

and be able to offer its members a variety health plan products with different levels of coverage. *Id.*

BCBSTX offers HMO and PPO network plans in Tyler. RR 218-221. In an HMO plan, benefits for covered services are provided only when members use providers in the HMO network, meaning the provider has an HMO contract with BCBSTX.[1] RR 220.

In a PPO plan, members have a greater choice of providers. RR 219. First, PPO networks are generally more robust. Second, unlike in an HMO plan, in a PPO plan a member will still have some level of benefit if they elect to obtain services from a provider that is not in the PPO network. However, a member who chooses to use a provider "in" the PPO network generally incurs less out-of-pocket expense (in deductibles and co-pays) than if the member obtains the same services from a provider who is not in (or "out of") the PPO network. RR 219. In this way, members enrolled in a PPO plan are economically incentivized to use "in-network" providers (referred to as "preferred providers") versus "out-of-network" providers. RR 219 (the "benefits [to members] provide the incentive" to members to use preferred providers).

---

[1] If an HMO plan member chooses to use a provider outside the HMO network for elective services, the insurer does not cover the services. RR 220. Because HMO plans restrict members' choice of providers, they generally cost members less than other types of plans. RR 224.

As explained, to achieve this range of coverage options, insurers like BCBSTX negotiate contracts with health care providers. RR 219-221, 224. Generally, providers agree to accept lower reimbursement rates in exchange for higher expected patient volume. RR 219-221, 224. Therefore, a provider who wants to contract with BCBSTX to be in a PPO network typically will agree to accept lower rates than that providers' billed charges (*i.e.,* off the shelf prices) because it can expect more PPO members to choose it, since members will incur less out of pocket expense to see the provider (as compared with a provider who is out of network). RR 219.[2]

A provider that does not have an HMO or PPO contract with BCBSTX and is therefore not in any BCBSTX network may still want to enter into a contractual arrangement with BCBSTX to provide both parties certainty with respect to the price and administration of services provided to a member of BCBSTX. In such instance, BCBSTX may enter into a "traditional indemnity" contract with the provider whereby the parties agree on specific rates and terms and conditions for payments.[3] *See* RR 227.

[2] HMO network providers typically will accept even lower rates, because they expect that the HMO plan will require many patients to choose them for medical services. RR 224.

[3] It is not unusual for a provider who is in an HMO or PPO network to also enter into a traditional indemnity agreement. Indeed, providers often have multiple contracts with BCBSTX which correspond to different products offered by BCBSTX. RR 221. For instance, a provider might not have a PPO contract with BCBSTX, but may have an HMO contract and a traditional indemnity agreement that would set reimbursement rate for services rendered to PPO members.

While contracted rates may vary from provider to provider, as might be expected, reimbursement rates under a traditional indemnity contract are generally higher than PPO or HMO reimbursement rates because the provider has less incentive to offer discounted rates. *See* RR 225-27. Given the direct relationship between patient volume and price, different products offered by BCBSTX to its members come at different prices points, all of which are impacted by a variety of factors including the mix of providers in the network and negotiated rates. Therefore, an insurer like BCBSTX tries to balance how it designs and builds its network with the scope of coverage (the number of providers) against the overall cost to members.[4] *See* RR 223-224.

In Tyler, BCBSTX operates a PPO plan covering about 30,000 of the 210,000 people in Smith County. RR 194. BCBSTX structures its PPO network to provide adequate and sufficient coverage for its members, while keeping their costs down. RR 217-218. The Texas Department of Insurance has approved BCBSTX's PPO network as providing adequate coverage. RR 251-252; DX 4 at BCBSTX3842, BCBSTX3875 (TDI responses approving BCBSTX's 2014 and 2015 network adequacy filings).

---

[4] Depending on the specific market, offering greater coverage in a PPO (*i.e.* offering more preferred providers) can increase the overall cost to customers. RR 225. For example, if a network is broadened to include more preferred providers, then each existing preferred provider may expect a lower volume of patients and may demand a higher rate. RR 225.

In Tyler, BCBSTX has PPO contracts with Trinity Mother Frances Hospital and the University of Texas Health Center, as well as hospitals in the East Texas Medical Center Regional Healthcare System outside of Tyler. RR 66, 88; PX 1 at ETMC0001722. As discussed below, ETMC is not, and has never been, designated as a preferred provider in BCBSTX's general PPO network—but it has an HMO contract, a single-employer PPO contract, and a traditional indemnity contract with BCBSTX. RR 89-90, 218.

### 2. ETMC Is A Large Hospital In Tyler, Texas

ETMC is one of three large hospitals in Smith County. CR 222-223. ETMC is financially stable and has operated successfully for decades without a PPO contract with BCBSTX. ETMC's annual revenues are approximately $800 million. RR 99. ETMC has approximately $300 million in cash and cash-equivalents on-hand, more today than it has ever had before. RR 99-101. Notably, that is more cash on hand than approximately 80% of the hospitals in the country. RR 297-298. In 2015, ETMC's patient admissions increased, and ETMC's patient volume has remained steady over the past six years. RR 101. For fiscal year 2016, ETMC expects a "steady improvement" in net income and "positive results." DX 8 at ETMC0001577.

In the past, ETMC has borrowed money by issuing bonds. RR 77. It owes "a little over $400 million" on its bonds, three-quarters of which can be covered with its $300 million in cash on hand. RR 176. In 2015, two bond-rating agencies downgraded ETMC's bonds. RR 74-76; DX 5, 6. But

those bonds remain investment grade. RR 76. Moreover, the latest financial information available indicates that ETMC is not even close to violating any of its bond obligations and will not be close to doing so any time before trial.

- While the bonds require ETMC to have approximately $125 million in cash on hand, ETMC has nearly $300 million. RR 304.

- While the bonds require ETMC to maintain a debt service coverage ratio of at least 1.1, ETMC's is 1.65. RR 301-308.

- While the bonds require ETMC to maintain a debt capitalization ratio of less than 70%, ETMC's is 49.3%. RR 301-308.

What's more, because ETMC's bonds have favorable notice and cure provisions, if ETMC were to violate a bond obligation in the near future, it would not default before *March 2018* at the earliest. RR 318-320.[5]

### 3. The Long History Of Contracts And Negotiations Between BCBSTX And ETMC

In 1993, after issuing an RFP for the PPO network and inviting hospitals in the Tyler area to submit bids, BCBSTX engaged in discussions with ETMC and the other hospitals in an effort to establish the best and most cost-effective PPO network for its members. RR 196-197, 242. BCBSTX reviewed the bids and put together a PPO network that ensured availability

---

[5] Specifically, the bonds provide that if ETMC were to violate a bond obligation before October 2016, it would not need to report that violation before March 2017, which would trigger a 165 day cure period to engage a management consultant—if that effort failed then ETMC would not have to report a second violation, putting it in default, until March 2018. RR 318-320 (testimony of BCBSTX's expert Jeffrey Benton).

and accessibility to providers to provide health care services to its customers. RR 249. That network did not (and still does not) include ETMC. RR 249.[6]

Since then, BCBSTX and ETMC have had ongoing discussions "nearly every year" regarding ETMC's desire to be in the PPO network, including "many meetings, many discussions, many emails, many letters." RR 198, 241-42; *see* RR 94 (ETMC CFO testifying that BCBSTX has had discussions with ETMC every year since at least 1998). However, BCBSTX and ETMC could not come to terms, so ETMC is not an in-network preferred provider in BCBSTX's PPO network. RR 90. BCBSTX has explained to ETMC that it decided not to enter into a PPO contract with ETMC because the BCBSTX network is adequate and a good value for customers without ETMC as a preferred provider. RR 249.

In 2000, for example, ETMC proposed rates for a preferred provider contract. RR 95. BCBSTX declined the offer, telling ETMC that it "would have to increase rates on other hospitals [in the PPO network] in an amount that would lead to costs to [BCBSTX] in order to accept [ETMC] into their network." RR 95 (testimony of ETMC's CFO). BCBSTX's decision was based on its evaluation of its network's sufficiency and its determination that its current network provided the best pricing option for BCBSTX members.

---

[6] But, as noted, ETMC and BCBSTX have other contractual relationships that set various reimbursement rates under the traditional and HMO products offered by BCBSTX. *See* pp. 16-18, *supra*.

RR 209-211. BCBSTX explained its decision and reasoning to ETMC in writing. RR 244; DX 2 (explaining BCBSTX's position and reasoning and identifying "impact on price" as a major concern); RR 243-246 (BCBSTX told ETMC that adding it to PPO network would raise BCBSTX members' total cost for medical coverage by at least 10%, potentially causing some members to drop coverage entirely). Specifically, BCBSTX told ETMC that:

> [t]he analysis by our actuaries indicated that, based upon the proposals received, the impact on price would be significant for a three-hospital network. The Tyler market is primarily comprised of small businesses which are very price sensitive. The anticipated double-digit increase would not be well-received and may contribute to some businesses dropping coverage, particularly adding to the already high uninsured rate in Texas.

RR 245-246 (quoting DX 2).

The talks continued during the following year, and BCBSTX wrote to ETMC in December 2001, once again explaining its reasoning. RR 247-248; DX 3. During these discussions with ETMC, BCBSTX offered to create a separate PPO network that included ETMC and all the facilities in Tyler. RR 216, 247-248. ETMC rejected the offer. RR 248.

And, more recently, in December 2014, BCBSTX's new Divisional Senior Vice-President of Health Care Delivery (Jack Towsley) together with other BCBSTX employees met with ETMC's CFO (Byron Hale) and CEO (Elmer Ellis) to discuss ETMC's services and its desire to be a preferred provider in the BCBSTX PPO network. RR 64, 193, 237-238. After the

meeting, BCBSTX reviewed "the pricing, the volumes, the services and looking at what would be the best expected value equation for [BCBSTX] customers" and determined, "for the foreseeable future, that the inclusion of ETMC did not make sense as improving … the value [BCBSTX] provide[s]" because the "existing PPO network of providers in the Tyler area was what would best serve [BCBSTX] customers." RR 240-41. The hearing testimony made clear that these were only a few representative examples of the robust ongoing discussions between ETMC and BCBSTX over the years. RR 248 (the letters admitted into evidence "capture the nature of the communications between the parties over the course of time").

### 4. The Status Of The Relationship Between BCBSTX And ETMC Before The Injunction

ETMC is not, and has never been, a preferred provider in BCBSTX's general PPO network. RR 90. ETMC and BCBSTX are, however, parties to a number of contracts. RR 89-90, 218. Specifically, ETMC and BCBSTX have HMO contracts setting ETMC's reimbursement rates for services provided to BCBSTX HMO members. RR 201. They also have a separate traditional indemnity contract. RR 65-66, 89, 225-228. In addition, they have a limited PPO contract that applies to only one of BCBSTX's employer group customers (*i.e.*, Brookshire Grocery, which is discussed below). RR 78-79. In their 30-year relationship, BCBSTX and ETMC have never had a PPO contract under which ETMC provides services as a preferred provider to members in BCBSTX's broader PPO plans. RR 90.

BCBSTX PPO members can still receive treatment at ETMC, however. BCBSTX PPO members currently account for 8% of ETMC's revenues. RR 83, 96. In terms of coverage or payment, if a BCBSTX PPO member *chooses* to go to ETMC, then ETMC is paid at the rates in the BCBSTX-ETMC traditional indemnity contract. RR 65, 89, 227, 232; PX 3. Doing so does not cost the member any more, however, because, as a matter of policy, ETMC adjusts the prices it charges such patients to ensure that it charges them no more than they would pay if seeing a preferred provider. RR 90-91, 123, 125, 138. If a BCBSTX PPO member *must* go to ETMC— *i.e.* if ETMC provides one of a few services not reasonably available at the other hospitals in BCBSTX's PPO network—then BCBSTX makes arrangements to pay in-network benefits, and the member does not incur the additional expense of going out-of-network. RR 230-231, 253; *see* TEX. INS. CODE § 1301.005(b).

BCBSTX does have a PPO contract with ETMC for one particular local health plan, Brookshire Grocery (an employer that wanted its employees to have access to ETMC at in-network rates). RR 78-79, 89. For the Brookshire PPO plan, the BCBSTX-ETMC Brookshire PPO contract specifies the rates paid to ETMC. RR 89. The Brookshire PPO rates are significantly lower than the rates in the BCBSTX-ETMC traditional indemnity contract. RR 232 (the traditional indemnity rates are approximately *90% higher* than Brookshire PPO rates).

Although BCBSTX's PPO network is adequate and it is not required to add ETMC, BCBSTX remains willing to negotiate in good faith with ETMC. RR 31, 43, 254-255, 344, 349, 352. At the hearing, BCBSTX offered repeatedly to negotiate in good faith, and even suggested court-supervised mediation. *Id.* ETMC chose instead to press for a mandatory injunction allowing it into the PPO network at the rates set forth in ETMC's traditional indemnity agreement with ETMC.

## B. Procedural History

### 1. ETMC Sues BCBSTX, Alleging A Right To Be Part Of BCBSTX's PPO Network—Initially Seeking Damages Only

On June 2, 2015, ETMC filed a Petition alleging that BCBSTX improperly excluded ETMC from its broad PPO network. CR 5. ETMC's original Petition asserted two claims: negligence, and interference with prospective business relations and economic advantage. CR 10-14.[7] Although styled as tort claims, these claims were based on alleged violations of Chapter 1301 of the Texas Insurance Code. CR 4-5. ETMC's Petition sought money damages only and did not reference a threat of imminent, irreparable harm. CR 14. On August 19, the trial court held a scheduling conference and—based on the parties' representations about the schedule,

_____

[7] ETMC levels similar allegations against co-defendants Aetna Health Inc., Aetna Life Insurance Company, Cigna Healthcare of Texas, Inc., and Cigna Health and Life Insurance Company, but it has not sought injunctive relief against them. CR 217-249.

discovery needs, and agreement—set the matter for trial on November 7, 2016. *See* 8/19 Tr. 9, 51.

### 2. ETMC Later Requests A Mandatory Temporary Injunction, Claiming That It Would Go Out Of Business Before Trial Without One

Barely a month later, on September 25, 2015, ETMC filed an Amended Petition requesting temporary injunctive relief. CR 217-249. The Amended Petition alleges that "[w]ithout immediate access to privately-insured patients such as insureds under [BCBSTX's PPO], ETMC has now begun to lose money on its hospital operations," and that "unless those losses are reversed and ETMC is able to make a profit, it will be unable to remain in business." CR 235-236. Based on these bare assertions about the profitability of ETMC's operations, ETMC sought a temporary injunction "allowing ETMC's immediate and full participation in [BCBSTX's] PPO network." CR 237. Although ETMC asked the court to order BCBSTX to pay the rates set forth in the existing BCBSTX-ETMC traditional indemnity contract "until new PPO agreements are negotiated and signed" (CR 237), it did not explain why a preferred provider under a PPO contract would merit the higher reimbursement rates ETMC had been paid under the traditional indemnity contract.

ETMC unilaterally noticed an injunction hearing for November 10, just a few weeks from the date its Amended Petition was filed. CR 250. BCBSTX objected to ETMC's demand to have its injunction request heard

- 19 -

on a truncated schedule. CR 252-266. BCBSTX explained that it would be deprived of due process if it were forced to defend an injunction request that would address a key issue in this case without sufficient time for discovery. CR 256-257. The trial court denied the motion (CR 297-298), and the parties conducted abbreviated discovery.

### 3. At The Injunction Hearing, ETMC Argues That, Without An Injunction, It Will Lose Money And Be Forced To Cut Services Before Trial

At the November 10 injunction hearing and over BCBSTX's objections, the trial court limited each party to only three hours to put on its case, cross-examine opposing witnesses, and present argument. RR 11-12, 33. As a consequence, BCBSTX could not fully examine one of its experts and was unable to even call another expert to the stand.

To show a cause of action and probable right to relief, ETMC argued that BCBSTX had unreasonably and unfairly declined to designate ETMC as a preferred provider in the BCBSTX PPO network, without informing it of the reasons. RR 71. In response, BCBSTX argued that ETMC had no cause of action because it could not enforce the Insurance Code provisions on which it relied, which were designed to benefit the public, not health care providers. *See* § III.A, *infra* (citing evidence and law). BCBSTX also presented evidence showing ETMC had no probable right to relief because BCBSTX had not unreasonably excluded ETMC from its PPO networks (which were adequate) and had engaged in years of discussions informing

- 20 -

ETMC of its reasons for not designating ETMC as a preferred provider. *See* § III.B, *infra* (citing evidence and law).

On the all-important imminent, irreparable injury requirement, ETMC did not argue or present evidence to prove the assertion it made about injury in its Amended Petition—namely, that it would go out of business if it did not have a PPO contract with BCBSTX. *See* CR 236 (asserting that ETMC "will not survive through trial of this matter"). Instead, ETMC changed its injury theory and declared that, if it was not designated as a preferred provider, it would lose money and be forced to cut services which, it argued, would harm it, doctors and the community. *See, e.g.*, RR 99, 140.

To show that it was losing money, ETMC pointed to the bond-rating agencies' recent downgrade of ETMC's bonds, and to the testimony of its CFO (Hale) that in recent months ETMC had begun to experience losses, which were relative modest (about $1 million per month). RR 72-76. To support its new, at-the-hearing theory that it would be forced to cut services as result of those losses, ETMC again relied primarily on Hale's testimony, which ETMC called "the best evidence we know of the threat of imminent harm." RR 339. Hale declared generally that, absent its inclusion in BCBSTX's PPO network, ETMC would be "forced" to and will "have to" cut services, and testified specifically that ETMC was "looking at" cutting certain services. RR 71-73.

In addition, an ETMC board member and physician testified that the board (relying on Hale's financial reports) has "had discussions about

eliminating Level 1 trauma" services. RR 179, 184. ETMC also presented the testimony of three other physicians who testified that their practices and patients would be harmed *if* ETMC made the threatened cuts to services. RR 120, 134, 148, 178. Each of these witnesses acknowledged, however, that he had no independent knowledge of ETMC's financial status or plans to cut services. RR 123-124, 139, 149.

For its part, BCBSTX argued, first, that ETMC was not at risk of going out of business or defaulting on its bonds. In fact, ETMC's CFO Hale admitted, and other uncontroverted evidence showed, that ETMC had no plans to close and there was no chance that it would fail (if was at risk of failing, which it was not) before the end of April 2016. *See* RR 99. Second, in response to ETMC's new harm theory, BCBSTX showed that ETMC could not prove an imminent, irreparable injury because ETMC's financial condition would not force it to cut services before trial, even accepting ETMC's own financial guesses. *See* RR 26-27. BCBSTX also argued that any financial losses could be compensated by monetary damages. *See* RR 34. Nor, as BCBSTX explained, were any financial losses caused by BCBSTX, since ETMC's evidence showed that the impact of not participating in the PPO network was minimal relative to ETMC's overall budget. *See* RR 322-323.

**C. The Trial Court's Mandatory Injunction Requiring BCBSTX To Contract With ETMC**

At the close of the hearing, the trial court granted ETMC's application for a mandatory temporary injunction (RR 356)—issuing the order ETMC provided the court near the end of the hearing (RR 334). CR 305-309. While the order cites no evidence or case law, it makes purported "findings" on each of the elements for issuing a temporary injunction: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

First, the order finds "that (at least) ETMC's negligence claim pleads a cause against [BCBSTX]" for "breaching the duties imposed on insurers under TEX. INS. CODE §§ 1301.051(a) and 1301.0151(b)." CR 305. The order, however, contains no legal analysis or explanation why those Code provisions impose on BCBSTX a duty owed to ETMC.

Second, the order finds that "ETMC has proved a probable right of relief on (at least) its negligence claim" because:

> ETMC has presented some evidence tending to sustain the allegations that [BCBSTX] (i) has failed to give it a fair, reasonable, and equivalent opportunity to be designated as a preferred provider in [BCBSTX's PPOs]; (ii) has unreasonably excluded ETMC from [BCBSTX's PPOs], and (iii) will likely continue to unreasonably exclude ETMC from [BCBSTX's PPOs] pending trial on the merits. That evidence is sufficient to show that a bona fide issue exists as to ETMC's right to ultimate relief on its negligence claim against [BCBSTX].

CR 305-306. The order, however, does not identify or describe the "some evidence" on which these conclusions are based.

Third, the order finds that "ETMC has proved that, absent the requested relief, it will suffer a probable, imminent, and irreparable injury in the interim before trial." CR 305. Adopting ETMC's contentions, the order concludes that ETMC and East Texas patients will be injured absent a mandatory injunction—reciting twice the Amended Petition's allegation that, without injunctive relief, ETMC will not be able to "fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare" and to improve "the quality of life for the people and communities [of] East Texas." CR 306-307. The order then states that ETMC's injuries are not compensable by money damages and that BCBSTX "will suffer no harm of any significance if the requested relief is granted." CR 306-307.

Based on these "findings," the trial court ordered BCBSTX into a contractual relationship with ETMC (*i.e.*, one where BCBSTX is required to pay ETMC fixed, non-negotiated rates for covered services performed for BCBSTX members)—putting the parties in the same position as if they had entered into a PPO contract at terms dictated by ETMC. Specifically, the court ordered BCBSTX to "desist and refrain from breaching [its] duties to ETMC by taking the following actions until the Court enters a final judgment in this case:" "allowing ETMC's immediate and full participation in [BCBSTX's] PPO networks at rates identical to those in [the traditional indemnity contract] in effect between ETMC and Blue Cross … until new PPO agreements are negotiated and signed;" listing ETMC as an in-network

provider in BCBSTX's directories; and allowing ETMC to "market itself as an in-network preferred provider in [the BCBSTX] PPO networks." CR308.

BCBSTX moved the trial court to stay enforcement of the injunction pending its appeal under Texas Rule of Appellate Procedure 24.2(a)(3). RR 361. The trial court denied the motion and permitted ETMC to enforce the injunction with the posting of a $10,000 bond, which ETMC posted. RR 363; CR 310. BCBSTX filed a notice of accelerated appeal on November 30, 2015. CR 323-324.

## SUMMARY OF ARGUMENT

The trial court's mandatory injunction alters the decades-long lawful *status quo* by compelling BCBSTX into a PPO contract with ETMC. There was no legal or equitable basis to compel that contract. Indeed, the fact—which is uncontroverted—that the injunction alters the *status quo* is reason enough to vacate the trial court's order. But the trial court erred in several other ways, any one of which also is an independent ground for reversal.

A mandatory injunction should not be issued unless the movant makes a clear and convincing showing that an injunction is needed to avoid extreme hardship. A failure to establish any one of the three prerequisites for injunctive relief—a cause of action, a probable right to relief, and an imminent, irreparable injury—means that an injunction is not justified. Here, ETMC failed on all three—yet, the trial court issued an injunction.

An examination of ETMC's arguments reveals the root of the trial court's error. ETMC argued—and its proposed order, which the trial court signed, reflected—that the injunction inquiry turns almost exclusively on a balancing of the harms and that ETMC needed only to raise a genuine issue fact to prove its injunction case. ETMC's approach, which the trial court adopted, is wrong for two reasons. First, ETMC's focus on the harm element does not give the required equal weight to whether ETMC proved that it had a cause of action and a probable right to relief. Second, on the harm element, the approach violates the settled rule that a party seeking a mandatory injunction must prove—with clear and convincing evidence—that it will suffer extreme hardship without an injunction.

Most notably, ETMC's injunction case faltered on the fundamental injury requirement. Without proof of an imminent, irreparable injury, no injunction may be entered as a matter of law. ETMC offered no objective evidence showing that it would be imminently and irreparably injured without an injunction—much less evidence of the type of injury sufficient to justify changing the decades-long *status quo*. To the contrary, all objective evidence showed that ETMC would not be forced to cut any services prior to trial (and thus ETMC was not at risk of imminent injury). And any financial injury ETMC might sustain (assuming it even could link those injuries to BCBSTX) could be compensated by money damages (and thus ETMC was not at risk of irreparable injury).

ETMC also failed to establish the existence of a cause of action against BCBSTX. As a matter of law, ETMC cannot enforce Chapter 1301 of the Texas Insurance Code against BCBSTX. The Texas Legislature clearly expressed its intention that these Insurance Code provisions benefit individual insureds and members, and be enforced by TDI only, not through private lawsuits brought by providers. ETMC cannot sidestep that legislative decision by wrapping its claims (based on supposed duties in the Insurance Code) in tort causes of action. In any event, ETMC also failed to show a probable right to relief on its claims—all of which are based on Chapter 1301—largely as a matter of law because the Texas Insurance Code does not create the duties ETMC seeks to impose on BCBSTX. The Insurance Code simply does not entitle ETMC to a preferred provider contract with BCBSTX, as even ETMC concedes (RR 95). Moreover, ETMC also failed to show that BCBSTX has violated the Insurance Code— in fact, the evidence showed the opposite. TDI has repeatedly approved the adequacy of BCBSTX's PPO network, and BCBSTX has engaged in good faith negotiations with ETMC that have provided ETMC with a fair, reasonable and equivalent opportunity to join BCBSTX's network as a preferred provider. That is all the Code requires.

In the end, although BCBSTX's decision not to enter into a PPO contract with ETMC is neither an Insurance Code violation nor a tort, ETMC filed this lawsuit asking the trial court to mandate such a contract on ETMC's chosen terms. That is an impermissible use of an injunction—

particularly in light of Texas's strong law and public policy protecting freedom of contact. This Court should vacate the injunction and put things back on track.

**STANDARD OF REVIEW**

This Court reviews the issuance of a temporary injunction for abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W. 3d 198, 204 (Tex. 2002). A ruling based on a legal error, or an incorrect application of law to the facts, is necessarily an abuse of discretion. *Walker v. Packer*, 827 S.W. 2d 833, 840 (Tex. 1992) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts."). It is also an abuse of discretion to issue a mandatory injunction based on insufficient factual evidence. *Mother and Unborn Baby Care v. Doe,* 689 S.W. 2d 336, 338 (Tex. App.–Fort Worth 1985, writ dism'd); *Grubaugh v. Texas Employers Ins. Ass'n*, 677 S.W. 2d 812 (Tex. App.–Fort Worth 1984), *dismissed* (Mar. 20, 1985) ("An abuse of discretion in granting an injunction arises when trial court findings are not supported by some evidence of substantial and probative character.").

**ARGUMENT**

**I. The Mandatory Injunction Should Be Vacated Because The Trial Court, At ETMC's Urging, Applied The Wrong Legal Standard**

A temporary injunction does not issue routinely, let alone as a matter of right. *Butnaru*, 84 S.W. 3d at 204. To obtain a temporary injunction,

ETMC needed to prove *each* of three elements: (1) a cause of action; (2) a probable right to relief; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* (citing *Walling v. Metcalfe,* 863 S.W. 2d 56, 57 (Tex. 1993); *Sun Oil Co. v. Whitaker,* 424 S.W. 2d 216, 218 (Tex. 1968)). Indeed, "[t]he law is well settled that a trial court abuses its discretion in granting a temporary injunction unless it is *clearly established by the facts* that one seeking such relief is threatened with an actual irreparable injury if the injunction is not granted." *Morris v. Collins*, 881 S.W. 2d 138, 140 (Tex. App.–Houston [1st Dist.] 1994), *writ denied* (Oct. 13, 1994) (citing *Mother and Unborn Baby Care,* 689 S.W. 2d at 338 (emphasis added).

Because ETMC sought a *mandatory* temporary injunction (*i.e.*, an order compelling affirmative action), it had heightened burdens.[8] A mandatory injunction may be imposed only in the rare "case of *extreme hardship*" and only where there is *clear and compelling* evidence supporting it. *Iranian Muslim Org. v. City of San Antonio,* 615 S.W. 2d 202, 208 (Tex. 1981) (emphasis added); *RP&R, Inc. v. Territo,* 32 S.W. 3d 396, 401 (Tex. App.–Houston [14th Dist.] 2000, no pet.) (requiring "clear and compelling presentation of extreme necessity or hardship"); *Rhodia, Inc. v.*

---

[8] Even though the trial court couched its directive in "cease and desist" language (CR 308), its order is a mandatory injunction because it requires BCBSTX to undertake action—that is, to enter a contractual relationship with ETMC, add ETMC to its PPO network, and list ETMC on its directories. *See e.g. Lifeguard Benefit Svcs. v. Direct Med. Net.*, 308 S.W. 3d 102 (Tex. App.—Fort Worth [2nd Dist.] 2010) ("A prohibitive injunction forbids conduct, and a mandatory injunction requires it.") (citation omitted).

*Harris County*, 470 S.W. 2d 415, 419-20 (Tex. App.–Houston [1st Dist.] 1971, no writ) (same) (citing 31 Tex. Jur. 2d 85, Injunction, § 32). To meet that heightened burden, a movant seeking a mandatory injunction must present "substantial and probative evidence" showing that it is entitled to such extraordinary relief. *Morris*, 881 S.W. 2d at 140; *RP&R,* 32 S.W. 3d at 401 (citing *Markel v. World Flight, Inc.* 938 S.W. 2d 74, 79 (Tex. App.–San Antonio 1996, no writ).

ETMC did not attempt to make these essential showings, but rather urged the trial court to simply balance the equities and grant ETMC's request for injunctive relief so long as ETMC's potential harm outweighed BCBSTX's and if ETMC merely presented some evidence to raise a material question of fact as to its probable right to relief. CR 290-292. ETMC told the trial court that this was a "pretty low evidentiary burden," going so far as to liken it to the "standard for avoiding a summary judgment." RR 337-338. Unsurprisingly, since ETMC wrote it, the trial court's injunction order applies that legally erroneous standard—one that is erroneous under both the prohibitory and mandatory injunction standards. *See e.g.* CR 305-306 ("ETMC has presented **some evidence** tending to sustain [its] allegations," which the court considered "sufficient to **show that a bona fide issue exists** as to ETMC's right to ultimate relief on its negligence claim.") (emphasis added). For that reason alone, the injunction should be vacated.

First, ETMC's assertion that a temporary injunction could issue based solely on a balancing of the harms simply is wrong. While a movant must

prove that it will suffer an imminent, irreparable injury, it must also prove it has a cause of action and a probable right to relief. Yet, ETMC relegated the cause of action and probable right to relief elements to mere formalities to be given lip service and then brushed aside. But they are real elements that must be proved and, thus, an injunction based on only a balancing of harms—without proof that the movant has a cause of action and a probable right to relief—cannot withstand scrutiny. *See Butnaru*, 84 S.W. 3d at 204 (movant "must plead and prove three specific elements"). The injunction order's cursory attention to the first two requirements suggests that the trial court followed ETMC's lead and did not consider whether ETMC had proved that it had a cause of action and a probable right to relief. As discussed in Section III below, ETMC failed to prove either.

Second, the trial court committed legal error by focusing on a balancing of the harms—rather than determining whether ETMC had proved ***imminent, irreparable*** injury—and adopting and applying ETMC's lowered standard to the "probable, imminent, irreparable injury" element. That was wrong in several respects. As a threshold matter, it was insufficient, as a matter of law, for ETMC to present only "some evidence" or evidence "tending to sustain" the conclusion that it would suffer such an injury. *See* CR 305-306. And, because ETMC sought a mandatory injunction, it needed to present "substantial and probative evidence" to make the "clear and convincing" or "clear and compelling" showing that it would suffer "extreme hardship" without an injunction. *Morris*, 881 S.W. 2d at 140;

*Iranian Muslim Org.*, 615 S.W. 2d at 208; *RP&R,* 32 S.W. 3d at 401; *Rhodia*, 470 S.W. 2d at 419-20. As discussed below, ETMC did not prove imminent, irreparable injury—let alone extreme hardship—but convinced the trial court to apply a watered-down "some evidence" standard to paper over this failure.

The combination of these two foundational problems with the standard the trial court employed resulted in the issuance of a mandatory injunction even though, as shown below, ETMC did not meet its burden on any of the well-settled elements that must be established to warrant an injunction.

**II. The Mandatory Injunction Should Be Vacated Because It Violates Settled Law Governing Injunctions In Two Fundamental Ways**

**A. The Mandatory Injunction Impermissibly Alters The Decades-Long Lawful Status Quo**

The purpose and function of a temporary injunction is to preserve the *status quo* pending a trial on the merits. *Butnaru*, 84 S.W. 3d at 204 (citations omitted). The *status quo* is the "the last, actual, peaceable, non-contested status which preceded the pending controversy." *Id.* As noted, during their decades-long relationship, BCBSTX and ETMC have never had a broad PPO contract. Thus, plainly, the *status quo* is that the parties have no PPO contract and ETMC is not a preferred provider in BCBSTX's PPO network.

- 32 -

This *status quo* is lawful and the court should not have altered it. The Texas Insurance Code does not require insurers to enter into additional preferred provider contracts under such circumstances, let alone enter into contracts designating *every* local provider as a preferred provider. Even ETMC admits this. RR 95 (ETMC CFO acknowledging that the Code is not an "any willing provider" statute). Instead, what the Code does require is that insurers (1) build networks that are adequate for their members and (2) give providers a fair, reasonable, and equivalent opportunity to be designated as preferred providers. TEX. INS. CODE § 1301.051. That is all the Code requires—and, as the uncontroverted evidence shows, that is exactly what BCBSTX did when it comes to ETMC. ETMC did not argue that BCBSTX's PPO network is inadequate—and it is uncontested that TDI has repeatedly found otherwise. RR 251-252; DX 4 at BCBSTX3842, BCBSTX3875. And, as discussed in more detail below, ETMC did not prove that it was deprived of an opportunity to be designated a preferred provider given that BCBSTX and ETMC have had decades of discussions and negotiations. *See* § III.B, *infra*.

The trial court's mandatory injunction, therefore, overreaches by destroying the lawful *status quo*—and that alone is reason enough to vacate the injunction. *City of Irving v. Dallas County Flood Control Dist.*, 383 S.W. 2d 571 (Tex. 1964) (A temporary injunction is not proper if "it would destroy rather than preserve the status quo."); *State Dept. of Highways & Public Transp. v. Elkins Lake Municipal Utility Dist.*, 593 S.W.

2d 401 (Tex. App.–Houston [14th Dist.] 1980) (vacating mandatory injunction because it "impermissibly changed the status quo").

Moreover, even if the trial court took issue with the *status quo* because it believed BCBSTX had not offered ETMC a fair, reasonable, and equivalent opportunity to be designated a preferred provider, the mandatory injunction was still not the appropriate remedy. If the court believed BCBSTX had not afforded ETMC the proper opportunity to be designated as a preferred provider, compelling BCBSTX to give ETMC that opportunity would have been the appropriate remedy. The court could have—as BCBSTX proposed—ordered the parties to mediation, which the court could have overseen to ensure fairness, reasonableness, and equivalency. *See* RR 344, 349; *see also* RR 31, 43, 254-255 (BCBSTX offering to negotiate in good faith). Instead, the court ordered far more than the Insurance Code requires—it ordered the parties into a contract that had never before existed, on terms dictated by ETMC. This is yet another reason why this Court should vacate the trial court's order. *See Sw. Research Inst. v. Keraplast Techs., Ltd.*, 103 S.W. 3d 478, 482 (Tex. App.–San Antonio 2003, no pet.) ("injunction must also be narrowly tailored to address the" illegality being enjoined).

## B. ETMC Did Not Prove The Core Element Of Probable, Imminent, Irreparable Injury

A party seeking a preliminary injunction must prove that it will suffer probable, imminent, and irreparable harm before trial without injunctive

relief. *See Butnaru*, 84 S.W. 3d at 204. Indeed, the harm element must be kept center stage because no injunction should issue without proof that it is essential to prevent imminent, irreparable harm. *See Lifeguard Benefit Servs., Inc. v. Direct Med. Network Sols.*, Inc., 308 S.W. 3d 102, 115 (Tex. App.–Fort Worth [2nd Dist.] 2010, no pet.) (no injunction when movant "did not demonstrate irreparable harm, an ***essential*** element of injunctive relief") (emphasis added); *Landry's Seafood Inn & Oyster Bar-Kemah, Inc. v. Wiggins*, 919 S.W 2d 924, 927 (Tex. App.–Houston [14th Dist.] 1996, no writ) (injunction "should only issue where [it] is ***essential*** in order to effectively protect … against injuries otherwise irremediable") (emphasis added, citation and quotation marks omitted). *Calvary Baptist Church at Tyler v. Adams*, 570 S.W. 2d 469, 474 (Tex. Civ. App.–Tyler 1978, no writ) (same).

ETMC's injunction case failed on this core element because it simply did not prove that ETMC would suffer a probable, imminent, and irreparable injury absent an injunction—much less present "substantial and probative evidence" to make the "clear and convincing" or "clear and compelling" showing of "extreme hardship" necessary to justify a ***mandatory*** injunction. *See, e.g.*, *Morris*, 881 S.W. 2d at 140.

To be probable, an injury must be more than "speculative," "conjectural," or "merely 'possible.'" *Mother and Unborn Baby Care*, 689 S.W. 2d at 338; *Brazoria County Appraisal Dist. v. Notlef, Inc.*, 721 S.W. 2d 391, 394 (Tex. App.–Corpus Christi 1986, no writ). To be

- 35 -

imminent, an injury must be likely to actually occur before trial. *See Butnaru*, 84 S.W. 3d at 204 (injury must be likely "in the interim" "pending trial on the merits"). To be irreparable, an injury must not be adequately compensable by monetary damages. *Id.* (citing *Canteen Corp. v. Republic of Tex. Props., Inc.,* 773 S.W. 2d 398, 401 (Tex. App.–Dallas 1989, no writ)).

The trial court's injury conclusion turned on its finding that because ETMC is "now losing money on its hospital operations each month," it will "be unable to maintain its current level of comprehensive medical care" pending trial. CR 307.[9] Neither the law nor the evidence supports that conclusion.

***Purely financial harm is not irreparable injury because it can be adequately compensated by monetary damages.*** *Butnaru*, 84 S.W. 3d at 204; *Canteen Corp.,* 773 S.W. 2d at 401. ETMC seeks monetary damages which are capable of calculation. *See* CR 238; RR 83 (ETMC estimating at hearing that the anticipated difference in its revenues from being in-network is approximately $14 million per year). This alone confirms that injunctive

---

[9] ETMC could not premise the injunction on its speculation about potential harm to third parties. Harm to the public not only was unproven (because, as explained, ETMC did not prove that it would be forced to cut services), but, in any event, would not be sufficient to justify an injunction as a matter of law. *See e.g., El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W. 3d 740 (Tex. App.–Dallas 2011, no pet.); *M P I, Inc. v. Dupre*, 596 S.W. 2d 251, 255 (Tex. App.–Fort Worth 1980, writ ref'd n.r.e.) (no injunction without injury or threat of injury to movant).

relief was not necessary or appropriate. *See Ballenger v. Ballenger*, 694 S.W. 2d 72, 76 (Tex. App.–Corpus Christi 1985, no writ) (holding there was an adequate remedy at law where damages were capable of calculation and where appellants were solvent and capable of paying damages).

*ETMC did not show imminent, irreparable injury.* In an effort to prove the type of injury that would warrant an injunction, ETMC alleged that its financial difficulties would force it to cut services. But ETMC failed to prove it would be forced to cut services at all, much less that it would need to during the time period that matters—the months before the specially-set November 2016 trial. In fact, the uncontroverted objective evidence showed the opposite—namely, that ETMC will not be forced to cut services before trial.

ETMC's only evidence of financial difficulties consisted of its downgraded bond ratings and its CFO's testimony that ETMC had begun to lose money. But neither established that ETMC would be forced to cut services before trial in this matter.

In an attempt to tie the bond downgrades to its claims against BCBSTX, ETMC pointed to statements by bond-rating agencies that ETMC's out-of-network status was one of several factors in the decision to downgrade ETMC's bonds. RR 77. But neither the rating downgrades—on bonds that remain investment grade—nor the financial facts on which they were based—proved a threat of imminent, irreparable harm. BCBSTX's expert offered unrebutted testimony that ETMC is in no danger of defaulting

on its bond obligations before March 2018, at the earliest. RR 318-320.[10] BCBSTX's expert also explained that the bond-rating agencies' statements regarding ETMC's non-preferred provider status did not show a causal connection between that status and the downgrade, since there are a "myriad" of "complex" factors that go into bond ratings. RR 322.[11]

ETMC's other so-called "evidence" of imminent, irreparable harm fared no better. ETMC leaned heavily on the testimony of its CFO (Hale), which ETMC called "the best evidence we know of the threat of imminent harm. RR 339. Hale testified that ETMC was "losing this year about $16 million," or "over a million a month." RR 72, 76. Yet, Hale said exactly the opposite to a bond-rating agency just two months earlier—saying that ETMC would be profitable in 2016. DX 8 at ETMC0001577 (predicting, for fiscal year 2016, a "steady improvement" in net income and "positive results").

Hale's further assertion at the hearing—that if ETMC keeps losing money, it will be forced to cut services at some time in the future—

---

[10] ETMC's attempt to paint its financial condition as dire because it had approximately $300 million in cash and approximately $400 million in debt should have been unavailing. RR 176. ETMC's cash on hand far exceeded the bond requirement (approximately $125 million). RR 304.

[11] ETMC's CFO noted that BCBSTX's expert witness's report opined only that ETMC would not close, without opining that ETMC would not cut services. RR 86. As explained above, ETMC changed its theory of harm for the hearing, so the expert report prepared in advance could not address that issue.

amounted to only conjecture and a conclusory declaration, not objective evidence that ETMC's financial state would in fact compel it to cut services. His testimony, therefore, is insufficient as a matter of law to carry ETMC's evidentiary burden. *See e.g. Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W. 2d 706, 712 (Tex. 1997) (witness testimony, without supporting objective evidence, insufficient to establish causation); *Kolbo v. Blair*, 379 S.W.2d 125, 130 (Tex. App.–Corpus Christ 1964, writ ref'd n.r.e.) (explaining that trial court's fact findings may be overruled "when they are without any evidence of probative force to support them, or where they are so against the great weight and preponderance of the evidence as to be manifestly wrong" and reversing where trial court's findings were based only on "uncertain, indefinite and qualified testimony") (citing *Banks v. Collins*, 257 S.W. 2d 97 (Tex. 1953)).

Although Hale declared that ETMC would be "forced" to and will "have to" cut services to remedy its financial losses (RR 73), ETMC presented no objective evidence that cuts to services were imminent or would occur before trial. Indeed, a close look what Hale actually said reveals that he did ***not*** testify that ETMC had actual plans to cut services, or that it would be forced to do so before trial absent an injunction. He testified only that ETMC needed to be a preferred provider in BCBSTX's PPO network to be "viable long-term" and that that ETMC was "***looking at*** changing our complement of services in a dramatic way" including "comprehensive reduction in services." RR 64, 72, 73; *see also* RR 179, 184

- 39 -

(ETMC board member and physician testifying only that board has "***had discussions about*** eliminating Level 1 trauma") (emphasis added). That is insufficient to establish the threat of ***imminent*** harm. And other evidence from Hale pointed in the other direction. Hale admitted that ETMC had not told regulators, doctors, vendors, or the community that it had plans to close. RR. 99. And when not influenced by ETMC's litigation position, Hale recently told the bond-rating agencies that ETMC expects to return to its prior profitability this year, making no mention of any plans to cut services. *See* DX 8; *id.* at ETMC0001577.

Apart from the testimony of Hale and a board member, ETMC offered only the testimony of three physicians who said they and their patients would be harmed ***if*** ETMC went out of business or was forced to cut services. RR 119, 134, 148-149, 178. But, the premise underlying the physicians' concerns was not proven because ETMC did not pursue its "risk of closing" theory at the hearing and also did not introduce objective evidence showing that it would be forced to cut services if it were not a preferred provider in BCBSTX's network. *See* RR 124, 139, 150-151, 184. Indeed, a number of the physicians—including department heads—testified that they had heard of no plans to cut services or any details about financial difficulties before the hearing. *See* RR 123-124, 139, 149.[12] Thus, ETMC

---

[12] Indeed, the head of the renal transplant department at ETMC—a service that Hale said might be cut (RR 73)—testified, contrary to what Hale had to say, that the department is profitable. RR 140-141.

did not meet its burden. It made no showing that it would be *forced* to discontinue services (much less that it would have to do so before trial).

Moreover, far from showing that ETMC would be forced to cut services before trial, the uncontradicted, objective evidence confirmed that ETMC has sufficient resources *not* to cut services in the near future. ETMC, is well positioned to cover any losses in the next year before trial—including the $16 million loss that Hale asserted, without support, ETMC might suffer. ETMC has on-hand cash and cash equivalents of nearly $300 million. RR 99-101. Hale did not explain why that cash cannot be drawn to cover that estimated loss, thereby preventing any alleged need to cut services before trial on the merits. RR 99. While ETMC *threatened* to cut services if it did not get its way, it will not be *forced* to do so—and a threat to inflict harm on oneself is not probable, imminent, irreparable injury. *Brazoria County Appraisal*, 721 S.W. 2d at 394 (injunction not warranted to forestall injury that is "merely possible"); *see also Petro Franchise Sys. LLC v. All American Properties, Inc.* 607 F. Supp.2d 781, 796, 797 (W.D. Tex. 2009) (movant's contention that "it is likely that [it] will [not] be able to continue as a going concern" does not justify injunction, especially where "the harm … allege[d] is at least partially self-inflicted").

***ETMC failed to show that its troubled financial condition was caused by the lack of a preferred provider contract with BCBSTX.*** Hale also testified conclusorily that ETMC's financial difficulties were caused by its exclusion from BCBSTX's preferred provider network. RR 60. But

there was, once again, no evidence of that alleged causal connection. The evidence that does exist points the opposite way. First, other Tyler-area hospitals that were designated preferred providers with BCBSTX have recently closed (RR 96, 171, 182), so broader changes in the health care market are likely responsible for ETMC's difficulties (*see* RR 182-183). Second, ETMC is not a preferred provider in the PPO networks of the Aetna and Cigna co-defendants (RR 89)—so any financial harm from not being a preferred provider would, under ETMC's theory, also be attributable to them, but ETMC has not sought an injunction against them (CR 217-249). Third, Hale's assertion that ETMC needed to be in BCBSTX's PPO network to be "viable long term" (RR 64) does not prove that the lack of in-network status has caused ETMC's financial problems.

Hale offered a "back of the napkin" estimate of how much ETMC's revenues would increase if it were permitted to participate in the PPO network. RR 98. But that guesstimate, unsupported by any objective financial evidence, is insufficient to make the required evidentiary showing on causation. In fact, it is non-probative *ipse dixit*. *See Havner*, 953 S.W. 2d at 712.

And, even on its own terms, Hale's estimate shows that any financial gain from being in the PPO network would be modest. Hale estimated the number of BCBSTX members seen daily at ETMC would increase by approximately 30% (from 40 to 52). *See* RR 83, 96. He estimated that uptick in patient volume would increase ETMC's revenues by about $14

- 42 -

million per year. RR 83. Because BCBSTX members currently account for only 8% of ETMC's revenues (RR 96), that estimated patient volume uptick amounts to only about a 2.4% change in ETMC's overall revenue. And, because ETMC's profit margin on new business is approximately 5% (*i.e.* ETMC expends 95% of revenue in costs to provide services), that revenue increase amounts to a ***profit*** increase of only $700,000 per year, which is minor compared to ETMC's overall revenues and its $300 million in cash on hand. RR 322-323. A difference in profits of $700,000 cannot, as a matter of law, constitute either an imminent, irreparable harm or an extreme hardship to an $800 million revenue hospital with $300 million available on hand.

***The trial court's order does not account for the injury to BCBSTX and the public that would result from the injunction.*** ETMC's failure to show that it would suffer an imminent, irreparable injury without an injunction is reason enough to vacate the trial court's order. But the trial court's injury analysis is even more problematic when the injuries the injunction would cause to BCBSTX and the public are considered. As ETMC concedes (CR 293), a trial court must look at the injury the non-movant and public would suffer if an injunction were entered and to balance those injuries with the injury the movant would suffer without an injunction. *See NMTC CORP. v. Conarroe,* 99 S.W. 3d 865, 869 (Tex. App.–Beaumont 2003, no pet.).

- 43 -

The trial court's injunction forces BCBSTX into a PPO contract with ETMC—but with BCBSTX paying ETMC traditional indemnity contract rates, not PPO rates. As explained, traditional indemnity rates are typically higher than PPO preferred provider rates (in the case of the Brookshire PPO, 90% higher on average). *See* pp. 9-11, *supra*. Thus the contract the trial court compelled requires BCBSTX to pay ETMC rates that are higher than the rates BCBSTX would expect to negotiate with ETMC for such a PPO contract.[13]

ETMC argued that BCBSTX's representative (Towsley, BCBSTX Divisional Senior Vice-President of Health Care Delivery) admitted BCBSTX would suffer no injury as a result of an injunction. RR 337, 362. But Towsley did not say that. Towsley testified that an injunction compelling it into a PPO contract with ETMC ***would*** injure BCBSTX in two concrete ways (which, in turn, might harm BCBSTX members). RR 234-237. First, Towsley testified that the injunction would increase the costs BCBSTX had to pay for services at ETMC because it would compel

---

[13] ETMC acknowledged the impropriety of using the out-of-network, traditional indemnity rates when it stated that it would be willing to revise the proposed mandatory injunction to use the in-network rates from BCBSTX's confidential PPO contract with Trinity Mother Frances Hospital, ETMC's competitor. RR 334-335. BCBSTX proposed using the rates from ETMC's existing Brookshire PPO contract (which, unlike the Trinity Mother Frances contract, is not confidential from ETMC, and covers all the services provided at ETMC). RR 344, 360. ETMC insisted on the traditional indemnity rates instead. RR 360-361.

BCBSTX to pay higher traditional indemnity contract rates to ETMC, when it would otherwise pay lower in-network PPO rates. RR 237, 265. Second, Towsley explained that compelling BCBSTX to put ETMC into the PPO network would draw patients away from existing preferred providers in Tyler and alter the pricing dynamic of the PPO network. RR 234-237, 265. The trial court's order simply does not account for these unchallenged injuries.

Moreover, the injunction will create confusion and cause hardship for doctors and patients—the very constituencies the injunction purports to protect. The injunction changes the *status quo* by inducing doctors and patients to make treatment decisions relying on the promise of in-network status for ETMC. But if BCBSTX prevails in the underlying litigation and is not required to enter into a PPO contract with ETMC, it will be difficult to revert to the pre-injunction *status quo* without undoing the promise the injunction compelled BCBSTX to make and disrupting courses of treatment than began in reliance on the injunction's grant of in-network status. The trial court's order does not account for this harm either.

\* \* \*

In sum, ETMC failed to prove an injury that was probable, imminent, and irreparable. It was legal error and an abuse of discretion for the trial court to enter a mandatory temporary injunction based on ETMC's unsupported speculation that it would suffer irreparable injury during the time it takes to adjudicate this case—particularly in the face of objective

evidence to the contrary. That error is a sufficient reason to vacate the mandatory injunction against BCBSTX. But, as shown below, there is more.

## III. The Mandatory Injunction Should Be Vacated Because, As A Matter Of Law, ETMC Does Not Have A Cause Of Action Against ETMC And Because ETMC Did Not Prove A Probable Right To Relief

### A. ETMC Has No Viable Cause of Action Because It Cannot Bring A Private Lawsuit To Enforce The Texas Insurance Code

There are fundamental legal problems with the very premise of ETMC's claims. Contrary to the trial court's finding, ETMC does not have a cause of action premised on the requirements of Texas Insurance Code Chapter 1301. As a matter of law, Chapter 1301 creates no private right of action to enforce the provisions ETMC invokes, so ETMC cannot state a claim for violations of them. Moreover, those provisions create no duties to ETMC, so ETMC cannot premise a negligence claim on alleged violations of such duties.

***All of ETMC's claims are premised on alleged violations of Texas Insurance Code Chapter 1301.*** Chapter 1301 of the Texas Insurance Code governs PPO plans. ETMC bases all of its claims on the requirements of Sections 1301.006, and 1301.051(a) and (b), which it referenced in its Amended Petition and repeatedly at the hearing. *E.g.,* CR 218, 220-222; RR 38-39, 338. The former provision, which is not cited in the court's injunction order, requires insurers to ensure the "availability of and

- 46 -

accessibility to adequate personnel, specialty care, and facilities." TEX. INS. CODE § 1301.006. The latter provision, which the court does cite, requires insurers to provide "a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider," and not to "unreasonably withhold a designation as a preferred provider." TEX. INS. CODE § 1301.051(a), (b).

The trial court expressly based the injunction on its finding that BCBSTX owed duties to ETMC arising out of the Insurance Code. CR 305 (stating that "ETMC has brought claims … for … negligence in breaching the duties imposed on insurers under [the Texas Insurance Code]" and "find[ing] that (at least) ETMC's negligence claim pleads a cause against [BCBSTX]" and that "ETMC has proved a probable right to relief on (at least) its negligence claim"); *id.* (citing "the duties imposed on insurers under TEX. INS. CODE §§ 1301.051(a) and 1301.051(b)").

***There is no private right of action under the Code provisions ETMC invokes.*** The Texas Insurance Code creates no private cause of action to enforce the relevant provisions of Chapter 1301. To the contrary, the Code specifies that Chapter 1301 is enforced by the Commissioner of the Texas Department of Insurance ("TDI"), which is tasked with adopting rules to "implement [Chapter 1301]" and adopting "network adequacy standards." TEX. INS. CODE §§ 1301.007, 1301.055. The Code and TDI's implementing regulations require insurers to submit annual reports, which TDI assesses to determine the adequacy of the PPO network. TEX. INS. CODE § 1301.009;

28 TEX. ADMIN. CODE §§ 3.4, 3.3704.[14]  In short, the Legislature decided the relevant provisions of Chapter 1301 should be enforced by TDI, and did not provide for the enforcement through private lawsuits.

Nor does Chapter 1301 create a private right of action by implication. Statutes do not create an implied private right of action "unless the drafters' intent is clear from the language." *Cernosek Enters., Inc. v. City of Mont Belvieu*, 338 S.W. 3d 655, 663 (Tex. App.–Houston [1st Dist.] 2011, no pet.); *see also Tuma v. Kerr Cnty.*, 336 S.W. 3d 277, 281 (Tex. App.–San Antonio 2010, no pet.) (voiding temporary injunction because applicants lacked standing under the Texas Health and Safety Code).  There is no such expression of intent in Chapter 1301.

Moreover, if Chapter 1301 did create an implied private right of action, it would be only on behalf of members, not providers like ETMC. A statute can create an implied private right of action only "on behalf of the injured person (or group of persons) for whose benefit the statute was enacted." *Lively v. Carpet Services, Inc.*, 904 S.W. 2d 868, 871 (Tex. App.–Houston [1st Dist.] 1995), *writ denied* (Feb. 9, 1996); *Nixon v. Mr. Property Management Co.*, 690 S.W. 2d 546, 549 (Tex. 1985) (same). Chapter 1301 was enacted for the benefit of network members (not providers). *See* TEX. INS. CODE §§ 1301.007 (directing TDI to adopt rules to

---

[14] BCBSTX presented evidence of its annual report and TDI's approval of its network's adequacy at the hearing.  DX 4 at BCBSTX3842, BCBSTX3875.

"ensure reasonable accessibility and availability of preferred provider services to residents of this state."); § 1301.0055 (directing TDI to adopt network adequacy standards to "ensure availability of, and accessibility to, a full range of contracted physicians and health care providers to provide health care services to insureds"). Thus, Chapter 1301 does not create an implied private right of action for providers like ETMC.

*The Code creates no duty that could form the basis of a negligence claim.* ETMC cannot circumvent the Legislature's decision not to authorize private enforcement of Chapter 1301 by premising a negligence claim on supposed violations of duties created by the statute, for two basic reasons. First, as explained above, Chapter 1301 was enacted to benefit PPO members, not providers, and thus it creates no duty to providers. Second, TDI regulations state expressly that Chapter 1301's requirements do not "create a standard of care, obligation, or duty that provides a basis for a private cause of action." 28 TEX. ADMIN. CODE § 3.3701(d). Therefore, negligence and other torts claims cannot be based on an alleged violation of a duty supposedly imposed by Chapter 1301.

Because ETMC has no viable cause of action against BCBSTX for violating Chapter 1301, it was legal error for the trial court to find that "ETMC's negligence claim pleads a cause of action against" BCBSTX. CR 305. This is reason enough to vacate the mandatory injunction.

## B. ETMC Did Not Prove A Probable Right To Relief Because It Did Not Show A Violation Of The Texas Insurance Code

Even if the Texas Insurance Code did authorize ETMC to assert a claim for purported violations of Chapter 1301, ETMC failed to present evidence of any such violations and thus failed to show it has a probable right to relief. As explained, ETMC alleged that BCBSTX violated Sections 1301.006 and 1301.051 by unreasonably excluding ETMC from BCBSTX's PPO network and not giving ETMC a fair, reasonable, and equivalent opportunity to be in-network. But ETMC produced no evidence to support those allegations or show any violation of the Insurance Code.

Nothing in Chapter 1301 requires BCBSTX to contract with a particular provider for its PPO network. Indeed, the Code expressly permits BCBSTX to "reject" a provider's application if its network is adequate. TEX. INS. CODE § 1301.051(d). Thus, ETMC has no statutory right to be included in BCBSTX's PPO network. In this regard, the Insurance Code aligns with Texas's "paramount public policy" of protecting the freedom to contract. *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W. 3d 905, 912 (Tex. 2007) (freedom to contract provides parties "the utmost liberty of contracting," and when such contracts are "entered into *freely* and *voluntarily* [they] shall be held sacred and shall be enforced by Courts of justice") (emphasis added). Courts may not "lightly [] interfere" with the freedom to contract. *Id.* And, here, the Texas Insurance Code provides no basis for doing so.

ETMC argues that, even if the Code does not entitle it to a PPO contract, it still could premise a probable right to relief on a purported violation of other Code provisions—specifically, Section 1301.006 (requiring adequate networks), Section 1301.051(a) (requiring insurers to give providers fair, reasonable, and equivalent opportunity to be designated as a preferred provider), and Section 1301.051(b) (requiring insurers to "not unreasonably" exclude insurers from network). That contention does not get ETMC any farther as a matter of fact or law.

Section 1301.006 requires BCBSTX to maintain an adequate PPO network, but ETMC presented no evidence to show that BCBSTX's network was inadequate. Instead, the undisputed evidence showed that TDI has repeatedly found that BCBSTX's PPO network is adequate. *See* RR 215, 251-252.

There also was no evidence that BCBSTX violated Sections 1301.051(a) and 1301.051(b) by failing to afford ETMC a fair, reasonable, and equivalent opportunity to be designated as a preferred provider or unreasonably excluding ETMC. To the contrary, the evidence showed that—since 1993 when BCBSTX first sought bids from providers—BCBSTX had considered ETMC's applications and proposals and negotiated with ETMC, but has not chosen to contract with ETMC for the PPO network because the network is adequate. *See, e.g.*, RR 94-95, 210-211, 223, 242-243.

ETMC did not offer objective evidence contradicting BCBSTX's reasons for its decision not to enter into a PPO contract with ETMC. Instead, ETMC's CFO Hale simply declared that he did not "believe" that network adequacy and impact on price are the real reasons BCBSTX has not done so (RR 95, 103) and ETMC called those reasons "gobbeldy goop" (RR 342).

BCBSTX, however, presented evidence showing that its stated reasons for not contracting with ETMC were its real reasons, as well as testimony establishing the reasonableness of BCBSTX's decision. As BCBSTX's Vice-President Towsley explained, BCBSTX provides different types of health care coverage to its members. BCBSTX achieves that variety of coverage and the best value for its members by entering into different kinds of contracts with different health care providers. And, as BCBSTX's representative explained, entering a PPO contract with ETMC could undermine those goals. Against this backdrop, Towsley explained that BCBSTX has chosen not to contract with ETMC because BCBSTX's existing PPO network is adequate and meets the needs of its members, and adding ETMC could upset the balance in Tyler created by BCBSTX's contracts with other providers. RR 242-249. ETMC presented no evidence of any other reason and no evidence that BCBSTX's network was inadequate.

In another effort to undermine BCBSTX's decision-making, ETMC complained that BCBSTX had not proposed a PPO contract with specific

rates to ETMC. RR 64. But ETMC pointed to no Code provision requiring BCBSTX do so—and there is none. Moreover, Towsley testified that the reason BCBSTX has not made an offer to ETMC is that BCBSTX's PPO network is adequate. RR 240-241.

ETMC also argued that BCBSTX had not told ETMC why it rejected ETMC's proposals for the PPO network. RR 178, 203. But the evidence showed the opposite. BCBSTX told ETMC repeatedly why it would not contract with ETMC—BCBSTX's network was adequate without ETMC, and adding ETMC to the network could adversely affect the price point of the network. RR 209-211, 243-246; DX 2. ETMC just did not believe the reason.

Finally, ETMC intimated that BCBSTX had not contracted with ETMC in order to protect BCBSTX's profits. RR 343. That implication gets ETMC no further. First, ETMC presented no evidence that BCBSTX was acting only to maximize profits. To the contrary, as explained, the evidence showed that BCBSTX's decisions took into consideration the interests of its customers, including self-funded customers paying for their employees' health coverage. *See* RR 242-249. Second, the Insurance Code does not bar insurers from making reasonable decisions—it bars them from ***unreasonably*** refusing to designate a preferred provider and from maintaining ***inadequate*** networks. As discussed above, ETMC failed to show that BCBSTX did either.

\* \* \*

In sum, ETMC's temporary injunction case failed for another independent reason—the Insurance Code does not authorize private lawsuits for alleged violations of Chapter 1301 and ETMC did not show a probable right to relief based on any such statutory violations in any event.

## CONCLUSION

The trial court's mandatory injunction destroying the lawful *status quo* and compelling BCBSTX into a contract with ETMC is missing both a legal and factual basis. A mandatory injunction is justified only if the movant makes a clear and compelling case on each of the three required elements. ETMC failed to make even one of those required showings. This Court, accordingly, should vacate the injunction.

Respectfully submitted,

_/s/ Martin J. Bishop_
Martin J. Bishop
State Bar No. 24086915
REED SMITH, LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
mbishop@reedsmith.com

**COUNSEL FOR APPELLANT**

_/s/ Greg Smith_
Greg Smith
State Bar No. 18600600
Stephen M. Spitzer
Texas Bar No. 18954850
RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, TX 75702
Telephone: (903) 597-3301
Facsimile: (903) 597-2413
gsmith@rameyflock.com
sspitzer@rameyflock.com

**COUNSEL FOR APPELLANT**

**CERTIFICATE OF SERVICE**

In accordance with the Texas Rules of Appellate Procedure, I certify that a true copy of this Appellant's Brief was served on the following counsel of record on this 29th day of December 2015:

Deborah Race
Otis W. Carroll, Jr.
Collin M. Maloney
Ireland, Carroll & Kelley, P.C.
6010 South Broadway Ave, Suite 500
Tyler Texas 75703

T. John Ward
Claire Abernathy Henry
Ward, Smith & Hill, PLLC
1127 Judson Road, Suite 220
Longview, Texas 75601

Michael C. Coker
Adams & Coker, P.C.
4540 Kinsey Drive
Tyler, Texas 75703
*Attorneys for Plaintiff East Texas*
*Medical Center*

Eliot T. Burriss
DLA Piper LLP
1717 Main Street, Suite 4600
Dallas, Texas 75201
*Attorneys for Defendant Cigna*

John B. Shely
Dimitri D. Zgourides
Andrews Kurth LLP
600 Travis St., Suite 4200
Houston, Texas 77002
*Attorneys for Defendant Aetna*

Clay M. White
White Shaver
205 West Locust Street
Tyler, Texas 75702
*Attorneys for Defendant Aetna*

Adam N. Bitter
Asst. Attorney General
Financial Litigation, Tax, & Charitable
Trusts Division
P.O. Box 12548
Austin, Texas 78711
*Attorney General of Texas*

　　　/s/ Greg Smith　　　　
　　　Gregory D. Smith

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4 because it contains 12,600 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(2)(B).

2.  This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using MS Word in 14-point Times New Roman font.

Dated: December 29, 2015.

_/s/ Greg Smith_
GREG SMITH

No. 12-15-00287-CV

_____

# In the Twelfth Court of Appeals
# Tyler, Texas

_____

BLUE CROSS & BLUE SHIELD OF TEXAS,
a Division of HEALTH CARE SERVICE CORPORATION,

Appellant,

v.

EAST TEXAS MEDICAL CENTER,

Appellee.

_____

*Accelerated Appeal*
*from the 241st Judicial Court Smith County, Texas, No. 15-1165-C*

_____

**APPENDICES**

_____

A.     Temporary Injunction And Order Setting Final Trial On The
       Merits, dated November 10, 2015 (CR 305-309)

B.     TEX. INS. CODE § 1301.051

C.     TEX. INS. CODE § 1301.006

# Appendix Tab A

CAUSE NO. 15-1165-C

| | | |
|---|---|---|
| EAST TEXAS MEDICAL CENTER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 241st JUDICIAL DISTRICT |
| | § | |
| BLUE CROSS & BLUE SHIELD OF TEXAS, | § | |
| a Division of HEALTH CARE SERVICE | § | |
| CORPORATION, AETNA HEALTH, INC., | § | |
| AETNA LIFE INSURANCE COMPANY, | § | |
| CIGNA HEALTHCARE OF TEXAS, INC., | § | |
| and CIGNA HEALTH AND LIFE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendants. | § | SMITH COUNTY TEXAS |



FILED

NOV 1 0 2015

LOIS ROGERS
CLERK 241st JUD. DIST. COURT. SMITH CO., TX
BY _____ DEPUTY

**TEMPORARY INJUNCTION AND ORDER SETTING**
**FINAL TRIAL ON THE MERITS**

On this the 10th day of November, 2015, the Court heard the application for temporary injunction filed by plaintiff East Texas Medical Center ("ETMC"). ETMC and defendant Blue Cross & Blue Shield of Texas ("Blue Cross") appeared in person and through their respective attorneys of record. After considering the application, the pleadings, the testimony of witnesses, the evidence admitted, and the arguments of counsel, the Court finds that the application should be GRANTED, and Blue Cross should be ENJOINED as requested.

ETMC has brought claims against Blue Cross (and others) for, inter alia, negligence in breaching the duties imposed on insurers under Tex. Ins. Code §§ 1301.051(a) and 1301.051(b). The Court finds that (at least) ETMC's negligence claim pleads a cause against Blue Cross.

The Court further finds that ETMC has proved a probable right of relief on (at least) its negligence claim against Blue Cross. Specifically, ETMC has presented some evidence tending to sustain the allegations that Blue Cross (i) has failed to give it a fair, reasonable, and equivalent opportunity to be designated as a preferred provider in Blue Cross's preferred provider benefit plans ("Blue Cross PPOs"); (ii) has unreasonably excluded ETMC from the Blue Cross PPOs, and

1



(iii) will likely continue to unreasonably exclude ETMC from the Blue Cross PPOs pending trial on the merits. That evidence is sufficient to show that a bona fide issue exists as to ETMC's right to ultimate relief on its negligence claim against Blue Cross.

The Court further finds that ETMC has proved that, absent the requested relief, it will suffer a probable, imminent, and irreparable injury in the interim before trial. Specifically, unless enjoined, Blue Cross will likely continue to exclude ETMC from the Blue Cross PPOs, resulting in irreparable harm and extreme hardship to ETMC and members of the public. Unless admitted immediately to the Blue Cross PPOs, ETMC will not be financially able to maintain its current level of comprehensive medical care to the community pending trial on the merits. In this regard, it will likely be forced to slash the medical services it provides, thereby resulting in either destruction, or significant disruption, of its operations. Either result would necessarily disenable ETMC's ability to fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare in East Texas and improving the quality of life for the people and communities of East Texas. Those injuries would be measured by the disruption or destruction of ETMC's ability to provide quality care to the people of East Texas. Such injuries cannot be measured by any certain pecuniary standard, and therefore cannot be compensated by money damages. ETMC has therefore proved probable, imminent, and irreparable injury to itself absent the requested injunctive relief.

In addition, ETMC's inability to continue providing the current level of medical care will result in imminent irreparable harm and extreme hardship to the public at large. The loss of not only ETMC's unique services, but also its hospital capacity, will detrimentally affect the healthcare needs of the citizens of East Texas through, inter alia, a decrease in treatment options, less continuity of care for East Texas patients, unreasonable interference with the doctor-patient

2

relationship, the loss of services provided only by ETMC in the area, and the lost capacity of one of the two large hospitals in Smith County.

The evidence shows that ETMC's exclusion from the Blue Cross PPOs leaves it out-of-network for the vast majority of privately-insured patients in Smith County and East Texas. Because of the increase in the differential between payments for in-network services and out-of-network services, the evidence shows that fewer and fewer patients can and will chose out-of network providers such as ETMC. This means that physicians often cannot use ETMC as a treatment option for their patients--even when those physicians believe that ETMC would provide the best care of their patients and the optimum integration of clinical services and continuity of care--resulting in fewer practical treatment options, unreasonable interference with the doctor-patient relationship, and less continuity of care for East Texas patients. This situation has skewed ETMC's patient make-up to such a degree that ETMC is now losing money on its hospital operations each month. Without immediate access to privately-insured patients under the Blue Cross PPOs, ETMC will be unable to maintain its current level of comprehensive medical care services to the community before a trial on the merits. Thus, without injunctive relief, ETMC will be unable to fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare, the success of which is measured by ETMC's impact on the quality of life for the people and communities in East Texas. ETMC's closure, or significant reduction in the services it provides, would result in irreparable injury and extreme hardship to East Texas patients who would have fewer health care options and no access to the services which only ETMC provides in the area. Accordingly, the evidence demonstrates and the Court finds that this temporary injunction is necessary to prevent irreparable harm and extreme hardship to ETMC and members of the public. The Court also finds that Blue Cross will suffer no harm of any significance if the requested relief is granted. The equities therefore weigh overwhelmingly in

3

Page 307

favor of ETMC and the residents of East Texas--and overwhelmingly against Blue Cross--because the total or partial loss of ETMC's services would constitute an extreme hardship and result in injuries not compensable by money damages.[1]

ACCORDINGLY, IT IS ORDERED that the application is GRANTED. Blue Cross and its agents, employees, independent contractors, attorneys, representatives and persons or entities in active concert or participation with Blue Cross who receive actual notice of this order by personal service or otherwise, are ordered to desist and refrain from breaching Blue Cross' duties to ETMC by taking the following actions until the Court enters a final judgment in this case:

1. Cease and desist from excluding ETMC from the Blue Cross PPOs by allowing ETMC's immediate and full participation in Blue Cross's Blue Options and Blue Choice PPO networks at rates identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross (effective August 15, 2012, as amended effective September 15, 2015), attached as Exhibit A to this Order, until new PPO agreements are negotiated and signed;

2. Cease and desist from excluding ETMC from its electronic preferred provider directories by listing ETMC as an in-network provider; and

3. Cease and desist from restricting ETMC's right and ability to market itself as an in-network preferred provider in Blue Cross's Blue Options and Blue Choice PPO networks.

IT IS FURTHER ORDERED that a trial on the merits of this case is set before this Court *on the ~~or in April, 2016, if agreed on between the parties,~~* on November 14, 2016, in the located in the Smith County Courthouse, 100 N. Broadway Room 220, 100 N. Broadway, Room 220, Tyler, TX 75601.

---

[1] Although not essential to the injunction granted herein, the Court finds that ETMC will likely prevail on the merits with respect to its claims that Blue Cross has violated Texas Insurance Code § 1301.051(a) and (b) by (i) failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Blue Cross PPOs, and (ii) unreasonably withholding from ETMC designation as a preferred provider in the Blue Cross PPOs, respectively. The Court further finds that in the absence of a temporary injunction, Blue Cross will continue its present conduct which will result in likely violations of the Texas Insurance Code causing irreparable harm and extreme hardship to ETMC and the public.

4

IT IS FURTHER ORDERED that the Clerk of this Court, upon the filing by ETMC of the bond required below, and on approving the bond according to the law, shall issue a temporary injunction in conformity with the terms of this Order. This Order shall not be effective unless and until ETMC executes and files with the Clerk a bond in the amount of $ _10,000._ which may be deposited with the Clerk in cash or by a cashier's check.

SIGNED on _November 10th_, 2015, at _6:00_ a.m./p.m.

_____

PRESIDING JUDGE

# Appendix Tab B

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 8. Health Insurance and Other Health Coverages (Refs & Annos)
      Subtitle D. Provider Plans (Refs & Annos)
        Chapter 1301. Preferred Provider Benefit Plans
          Subchapter B. Relations with Physicians or Health Care Providers

V.T.C.A., Insurance Code § 1301.051

§ 1301.051. Designation as Preferred Provider

Effective: September 1, 2015
Currentness

(a) An insurer shall afford a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider to practitioners and institutional providers and to health care providers other than practitioners and institutional providers, if those other health care providers are included by the insurer as preferred providers, provided that the practitioners, institutional providers, or health care providers:

(1) are licensed to treat injuries or illnesses or to provide services covered by a health insurance policy; and

(2) comply with the terms established by the insurer for designation as preferred providers.

(b) An insurer may not unreasonably withhold a designation as a preferred provider.

(c) An insurer shall give a physician or health care provider who, on the person's initial application, is not designated as a preferred provider written reasons for denial of the designation.

(d) Unless otherwise limited by this code, this section does not prohibit an insurer from rejecting a physician's or health care provider's application for designation based on a determination that the preferred provider benefit plan has sufficient qualified providers.

(e) An insurer may not withhold a designation to:

(1) a podiatrist described by Section 1301.0521; or

(2) an optometrist, therapeutic optometrist, or ophthalmologist described by Section 1301.0522.

**Credits**
Added by Acts 2003, 78th Leg., ch. 1274, § 3, eff. April 1, 2005. Amended by Acts 2005, 79th Leg., ch. 728, § 11.034(a), eff. Sept. 1, 2005; Acts 2015, 84th Leg., ch. 1271 (S.B. 684), § 1, eff. Sept. 1, 2015.

V. T. C. A., Insurance Code § 1301.051, TX INS § 1301.051

Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# Appendix Tab C

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 8. Health Insurance and Other Health Coverages (Refs & Annos)
      Subtitle D. Provider Plans (Refs & Annos)
        Chapter 1301. Preferred Provider Benefit Plans
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 1301.006

§ 1301.006. Availability of and Accessibility to Health Care Services

Effective: September 28, 2011
Currentness

(a) An insurer that markets a preferred provider benefit plan shall contract with physicians and health care providers to ensure that all medical and health care services and items contained in the package of benefits for which coverage is provided, including treatment of illnesses and injuries, will be provided under the health insurance policy in a manner ensuring availability of and accessibility to adequate personnel, specialty care, and facilities.

(b) A contract between an insurer that markets a plan regulated under this chapter and an institutional provider may not, as a condition of staff membership or privileges, require a physician or other practitioner to enter into a preferred provider contract.

**Credits**

Added by Acts 2003, 78th Leg., ch. 1274, § 3, eff. April 1, 2005. Amended by Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7), § 10.01, eff. Sept. 28, 2011.

V. T. C. A., Insurance Code § 1301.006, TX INS § 1301.006
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.